Robert W. Ottinger (SBN 156825)
Melanie L. Proctor (SBN 228971)
**THE OTTINGER FIRM, P.C.**
535 Mission Street
San Francisco, CA 94105
Tel: 415-262-0096
Fax: 212-571-0505
robert@ottingerlaw.com
melanie@ottingerlaw.com

*Attorneys for Plaintiff*
RYAN SLOAN

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| RYAN SLOAN,<br><br>　　　　Plaintiff,<br><br>　　vs.<br><br>VERILY LIFE SCIENCES, LLC, a Delaware Limited liability company,<br><br>　　　　Defendant. | **Civil Action No.: 24-cv-07516-EMC**<br><br>**FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL** |

Plaintiff, Ryan Sloan, by and through his attorneys, The Ottinger Firm, P.C., complaining of Defendant, VERILY LIFE SCIENCES, LLC, alleges as follows:

**INTRODUCTION**

1. Plaintiff Ryan Sloan ("Plaintiff" or "Mr. Sloan") was employed as the Chief Commercial Officer for Onduo, a healthcare provider subsidiary of Verily Life Sciences, LLC ("Defendant" or "Verily"). At all times relevant to this matter, Verily is and was Alphabet Inc.'s research organization that specializes in health technology with a primary focus on clinical research, care, and health financing. Mr. Sloan's employment with Verily began on September 28, 2020. (*See* **Exhibit A**, Verily Offer Letter).

2. Plaintiff Ryan Sloan brings this action pursuant to the Family Medical Leave Act ("FMLA") 29 U.S.C. § 2615(a)(1) for FMLA interference; the Americans with Disabilities Act of 1990,

as codified, 42 U.S.C. §§ 12112 to 12117, and Cal. Gov. Code § 12900, *et seq*. for discrimination based on his association with a disabled individual, namely his mother; Cal. Labor Code § 1102.5 for whistleblower retaliation; and 42 U.S.C. § 2000e-3(a), retaliation for making an Equal Employment Opportunity Commission charge.

3. Defendant wrongfully retaliated against Plaintiff after Plaintiff reported ████████████ ██████████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████████████ ████████████████████████.

4. Furthermore, at the time of the Reduction In Force ("RIF") through which Defendant terminated Plaintiff's employment, Plaintiff was on protected leave under the FMLA. Upon his return from protected FMLA leave, Defendant did not offer Mr. Sloan a comparable role, nor honor his request to adjust the benefit start date to accommodate his leave: namely, Plaintiff requested that Defendant delay the start of his 60-day benefit period under the RIF until his return from protected FMLA leave. Mr. Sloan requested this in order to receive the 60 days of internal transition networking and external job search assistance that the other RIF terminated employees received. Defendant summarily denied Plaintiff's request for this accommodation, without engaging in an interactive process with Mr. Sloan.

## STATEMENT PURSUANT TO LOCAL RULE 9

5. For purposes of complying with Local Rule 9, Plaintiff states that he has no corporate parent, subsidiary, or affiliate and that there are no other interested parties.

## JURISDICTION AND VENUE

6. This Court has subject matter jurisdiction under 28 U.S.C. § 1331, 28 U.S.C. § 1332, and 29 U.S.C. § 2617(a)(2).

7. Complete diversity of citizenship exists because Plaintiff is a resident of Georgia and Defendant is incorporated in Delaware, with its headquarters in Texas. The amount in controversy exceeds $75,000.

8. Venue is proper in the Northern District of California under 28 U.S.C. § 1391(b)(2) as the acts and omissions giving rise to these claims occurred within this district, at the time the events giving rise to Plaintiff's claims occurred Defendant was headquartered in this district, and Defendant conducts substantial business within this district. Defendant moved from California to Texas *only after* the incidents at issue in this matter occurred.

9. Defendant is a corporate entity with a workforce of over 100 employees. Defendant is a person within the meaning of 42 U.S.C. § 12111(7) and 29 U.S.C. § 2611(4).

10. Defendant is an employer within the meaning of 42 U.S.C. § 12111(5), and a covered entity within the meaning of 42 U.S.C. § 12111(2) and 29 C.F.R. § 1630.2.

11. Plaintiff has exhausted his administrative remedies by receiving a Right to Sue letter from the Equal Employment Opportunity Commission on July 31, 2024.

12. There is no administrative exhaustion requirement for Plaintiff's FMLA claims against Defendant.

13. The decisions and conduct at issue in this case occurred primarily in South San Francisco where Defendant was based at that time. The primary actors such as the head of Human Resources, the CEO and General Counsel and others were all based in California.

## **PARTIES**

14. Plaintiff is currently a resident of Georgia. At all times mentioned herein, Plaintiff was a resident of Georgia working remotely for a California based company and connecting to California based offices where his supervisors were headquartered in California at that time.

15. Plaintiff is an individual who resides in Marietta, Georgia. At all relevant times, Plaintiff was employed by Verily under an agreement governed by California law, Plaintiff worked remotely in a California-based role during his tenure, and Plaintiff met the definition of an "employee" under applicable statutes, laws, and regulations. At all times mentioned herein Verily's corporate headquarters was located in South San Francisco, California.

16. Plaintiff is represented in this case by The Ottinger Firm, P.C.

17. Defendant is a Delaware Limited liability company that was and still is a corporation engaged in medical component servicing and research. Defendant is organized under the laws of the State

of Delaware and its headquarters is located at 2999 Olympus Blvd, Ste 1000, Dallas, Texas 75019 only as of the end of Q3 2024.[1] Prior to that date, it was headquartered in South San Francisco, California.

18. At all relevant times, Defendant had and still has at least fifty employees working within this district, and this is the district in which the events took place.

19. Verily is a limited liability company organized and existing under the laws of the state of Delaware, with their principal place of business now in Texas, and operating in California with several offices throughout the United States. Verily maintains a registered agent in California. As of December 11, 2024, its website still states that it is "anchored in the epicenter of biotech---San Francisco Bay Area, California."[2] Only 60 of Verily's 1,400 employees work at Verily's Dallas office.[3] At all relevant times, Verily met the definition of "employer" under applicable statutes, laws, and regulations.

## FACTS

### Mr. Sloan Is Recruited to Onduo

20. In March of 2017, Mr. Sloan was contacted by Defendant to discuss a Retinal Camera Program that Verily was developing. Verily's outreach to Mr. Sloan occurred after media coverage of an innovative camera he developed to detect diabetic retinopathy. In May of 2017, Plaintiff participated in several meetings at Defendant's headquarters where Verily discussed their Retinal Camera Program. Thereafter, on or about December 11, 2017, Plaintiff and four (4) Verily employees worked together on a joint pilot program for a Texas Health Insurer called Superior Health.

21. On April 7, 2020, Defendant offered Mr. Sloan an executive position at Onduo, a subsidiary of Verily. Defendant offered Mr. Sloan a substantial compensation package which included a $200,000 signing bonus to induce Mr. Sloan to resign from his then-current employer, Vitality Group International.

22. Plaintiff accepted Defendant's offer and began his tenure as Chief Commercial Officer of Onduo on September 28, 2020.

---

[1] Noor Adatia, "Alphabet company Verily moving headquarters from California to North Texas," *Dallas Business Journal*, July 24, 2024 (*available at* https://www.wfaa.com/article/money/business/alphabet-company-verily-moving-headquarters-dfw/287-382d650a-d293-4adc-a762-8d96478256f1#:~:text=San%20Francisco%2Dbased%20Verily%20Life,Dallas%20office%20in%20June%202022).

[2] "Careers," *Verily* (*available at* https://verily.com/about-us/careers [visited December 11, 2024].)

[3] Adatia, "Alphabet company Verily moving headquarters from California to North Texas."

4

FIRST AMENDED COMPLAINT

**Mr. Sloan Establishes an Early Track Record of Success as Onduo's Chief Commercial Officer**

23. Plaintiff delivered strong performance and demonstrated impact as soon as he joined Verily. For example, in his first six (6) months of employment, Plaintiff built the following functional capabilities within Onduo, where none had existed before: a sales and marketing organization, and Verily's first true sales team. After standing up these functions, Plaintiff developed and led implementation within them of new business processes including Sales Commissions, Quotas, and Sales Pipeline Forecasting. Mr. Sloan's performance met or exceeded his 2020 incentive goals, and he received 100% of the eligible award and a 2.85% salary adjustment according to Defendant's incentive program.

24. Plaintiff continued to drive success for Verily in 2021, his first full year with Defendant's organization. That year, Mr. Sloan led the Onduo business to successfully reach an aggressive Sales Bookings target: the team Mr. Sloan led originated and signed Verily to a 6-year agreement with Highmark Health, a large health plan with around 6,000,000 members. The Highmark Health deal generated the highest revenue of any Verily contract in 2021.

25. As Chief Commercial Officer, Plaintiff also met regularly with the Verily Retinal Camera product team, and helped develop the core framework of its planned commercial offering and go-to-market strategy. In November of 2021, Plaintiff, using his network, cultivated and secured the commitment of Superior Health to be the first health plan associated with the Retinal Camera program.

26. Impressed with Onduo's growth potential, in March of 2022 Verily decided to fully integrate the Onduo subsidiary into its operations. In April of 2022, Verily offered Plaintiff a new compensation structure with another 2.85% base salary adjustment as well as $225,250 in one-time discretionary payments to ensure that Mr. Sloan did not have any gaps in receiving his due bonuses.

27. Plaintiff transitioned formal employment to Verily beginning April 25, 2022. Plaintiff was assigned to report to a new supervisor: Verily Chief Revenue Officer Lisa Greenbaum.

28. In June of 2022, Plaintiff had his first performance review with Ms. Greenbaum, which was enthusiastic and positive. During this review meeting, Ms. Greenbaum communicated that Mr. Sloan's reputation and status continued to rise at Verily, and she asked if Mr. Sloan would be willing to assume a full business leadership role for the Verily Retinal Camera program in 2023. In the same meeting, Mr. Sloan expressed his strong interest in accepting this elevation of his responsibilities, seeing it as a

natural and sought-for career progression, given his historical contributions to the success of the Retinal Camera program and prior experience in that sector.

**Mr. Sloan Discovers and Reports Verily's** ▇▇▇▇▇▇

29. ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

30. ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

31. ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

---

[4] For example, Verily Onduo announced its partnership with Walgreens Boots Alliance. "*Walgreens Boots Alliance and Verily Announce Strategic Partnership to Innovate on New Solutions to Improve Health Outcomes*," Dec. 19, 2018 (available at https://verily.com/perspectives/walgreens-boots-alliance-and-verily-announce-strategic-partnership-to-innovate-on-new-solutions-to-improve-health-outcomes. Verily disclosed its partnership with Blue Cross

1  32.  ███████████████████████████████████████
2  ███████████████████████████████████████████
3  ███████████████████████████████████████████
4  ███████████████████████████████████████████
5  █████████████████████████████

6  33.  As Chief Commercial Officer of Onduo, Plaintiff was responsible for all external client
7  communications. ███████████████████████████████
8  ███████████████████████████████████████████
9  ███████████████████████████████████████████
10 ███████████████████████████████████████████
11 ███████████████████████████████████████████
12 ███████████████████████████████████████████
13 █████████

14 34.  ███████████████████████████████████
15 ███████████████████████████████████████████
16 ███████████████████████████████████████████
17 ████

18 35.  ███████████████████████████████████
19 ███████████████████████████████████████████
20 ███████████████████████████████████████████
21 ███████████████████████████████████████████
22 ██

23 36.  ███████████████████████████████████

---

Blue Shield of Arkansas and Georgia and life insurer John Hancock. "Onduo and scaling the virtual care model," Dec. 11, 2019 (available at https://verily.com/perspectives/onduo-and-scaling-the-virtual-care-model. And, Verily announced its ""Healthy at Work" partners include the publicly-traded Quest Diagnostics and Fulgent Genetics. "Verily Announces New Customers and Partners for its Healthy at Work Program," July 30, 2020 (available at https://verily.com/perspectives/verily-announces-new-customers-and-partners-for-its-healthy-at-work-program). Verily also disclosed its engagement with Highmark Health. "Highmark Health engages Verily to reinvent the healthcare experience for Highmark Health customers and clinicians," March 2, 2021 (available at https://verily.com/perspectives/highmark-health-engages-verily-to-reinvent-the-healthcare-experience-for-highmark-health-customers-and-clinicians).

7

FIRST AMENDED COMPLAINT

1 ██████████████████████████████████████████████████████
2 ██████████████████████████████████████████████████████
3 ██████████████████████████████████████████████████████
4 ██████████████████████████████████████████████████████
5 ██████████████████████████████████████████████████████
6 ██████████████████████████████████████████████████████
7 ██████████████████████████████████████████████████████
8 ████

9  37. On August 17, 2022, Verily abruptly terminated two (2) of Plaintiff's closest colleagues who were most knowledgeable ████████████████: Julia Feldman (Onduo General Counsel), ████ ████████████████████████████ and Allison Orenstein (Onduo VP of Marketing), ████ ██████████████████████████████████████████████████████
████████████████████████████████

 38. Throughout September and October 2022, ████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
████████████████████████████████

 39. On October 12, 2022, during a sales training meeting in Dallas on the Precision Health messaging, Plaintiff again discussed his concerns with his boss, Ms. Greenbaum, about the urgency of
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████

8
FIRST AMENDED COMPLAINT

1  ▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪

2   40.    At that time, Ms. Greenbaum was lobbying internally at Verily for a promotion for herself
3   and chose to align with Verily senior managers in concealing the illegal activity. Ms. Greenbaum's career
4   aspirations were at odds with Plaintiff's desire to notify clients and key stakeholders ▪▪▪▪▪
5   ▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪

### Mr. Sloan Is Targeted for Termination from Verily

41.    On November 14, 2022, at a sales conference in Las Vegas, Ms. Greenbaum informed Plaintiff that a company reorganization was planned where Ms. Greenbaum would be promoted to Chief Commercial Officer. She then told Mr. Sloan that the Verily Onduo business and the Medical Devices business would be "deprioritized," with all projects being stopped except for the Retinal Camera program. She told Plaintiff his position would be eliminated, and he would be replaced by a less experienced colleague (the replacement she identified was Level 6, while Mr. Sloan was Level 8). Plaintiff was shocked, as his performance feedback from Ms. Greenbaum had been, until that time, uniformly positive.

42.    In ending that November 14, 2022, conversation, Ms. Greenbaum indicated to Mr. Sloan that company-wide decisions about the Onduo "deprioritization" were still underway, and would not be finalized until January 2023.

43.    After his conversation with Ms. Greenbaum, Plaintiff continued his work and spoke to other colleagues about possible alternative roles at Verily. In the course of ordinary duties, during this period Plaintiff was also added to a Trusted Insiders list, and given classified information, in accordance with the shared expectation that he would have an ongoing role within Verily or another division of Alphabet Inc.

### Mr. Sloan Takes Urgent Carer Leave under FMLA

44.    On November 30, 2022, Plaintiff received an urgent call that his mother was rushed to the emergency room with seizures from a previously undetected cancer in her brain. His mother was in a coma and would require emergency brain surgery. Plaintiff was the only family member in the area, and he held the Medical Power of Attorney for his mother's healthcare decisions.

45.    On December 6, 2022, Plaintiff requested a leave of absence under the Family Medical Leave Act to care for his mother. On December 19, 2022, Plaintiff received a letter acknowledging his

Carer's leave (pursuant to Defendant's policy) beginning on December 6, 2022, but denying his claim under the FMLA. At that point, Plaintiff had been employed by Verily for over 12 months and had fulfilled all other requirements for FMLA eligibility, including submission of medical records of his mother's cancer treatment and surgeries.

46. After Plaintiff appealed his FMLA denial internally, a Verily Human Resources supervisor found that Plaintiff's FMLA leave had been improperly denied and approved his FMLA leave with retroactive application for December 6, 2022, through and including February 27, 2023.

## Verily Terminates Mr. Sloan in a Reduction In Force, and Does Not Provide Him a Role Upon Return from Leave

47. On January 11, 2023, while on approved FMLA leave, Plaintiff received a phone call from Lisa Greenbaum that he would receive a job elimination communication, and that despite being absent on approved FMLA leave, he was expected to complete performance reviews. Greenbaum informed Plaintiff that his email account and computer access would be turned off immediately, and that he should receive information for a transition email account.

48. The transition email account was not properly set up; Plaintiff was forced to seek assistance to resolve the issue.

49. To ensure he could complete the required performance reviews, Plaintiff saved several files to his Dropbox account.

50. On January 11, 2023, Plaintiff was informed via email from the "Verily Leadership Team" that his position as Chief Commercial Officer had been eliminated due to a "reduction in force." Plaintiff forwarded the RIF email to his personal email.

51. Plaintiff was not considered for other roles at Verily for which he was well-qualified. Verily severance paperwork included ADEA disclosures that indicated the position of his peer Rich Glenn, whom also held the job title "Verily Director, Sales – Direct Sales," had also been eliminated in the reduction in force, but Mr. Glenn *was* offered an alternative position.

52. The reduction in force notice from the "Verily Leadership Team" stated that Mr. Sloan's 2022 bonus would be funded "at target," meaning a bonus of 100% of his salary.

53. On January 12, 2023, Plaintiff learned from former employees that his job responsibilities,

including managing the Onduo business and Verily's Retinal Camera Program, had been assigned to Rich Glenn. Despite Mr. Glenn's new role being disguised as Head of Commercial rather than Chief Commercial Officer, the role had an equivalent job level and entailed leading the Onduo commercial team, including Sales, Account Management, and Partnerships.  These responsibilities fell entirely within scope of Plaintiff's prior Chief Commercial Officer role. This contradicted the information provided by Ms. Greenbaum on November 14, 2022, when she indicated that Plaintiff's role had been eliminated and his responsibilities were to be reassigned to lower-level employees.

54. On or about January 13, 2023, Google Security contacted Plaintiff. He met with Annie Zhang, and explained that he had downloaded files to complete the required performance reviews. While she remoted into his computer and watched, he deleted the files on his Dropbox account. Ms. Zhang confirmed that nothing had been accessed. That same day, Plaintiff signed an affidavit attesting that he had deleted the files.

55. Regardless, Defendant, through Lisa Greenbaum and Defendant's Human Resources insisted that Plaintiff complete the performance reviews, meeting with him on January 13, 2023 and following up via email on January 19, 2023. Contrary to Verily's representations that it was deprioritizing Onduo, throughout 2023, Defendant actively promoted the Onduo business (rebranded as Verily Onduo) and prominently featured Onduo as the primary product on its newly-rebranded website.  Recent news articles in PR News Wire and WebMD Health Services confirm that Verily's Onduo business had established new partnerships with major healthcare organizations such as WebMd. In an interview on November 20, 2024, Verily CEO Stephen Gillett highlighted the success of Onduo and cited a clinical study.[5]  It is not surprising that Verily prioritized, and did not deprioritize Onduo, as on October 8, 2022, Verily had paid $175 million for the remaining 19% of Onduo, giving Onduo an enterprise valuation of close to $1 billion.[6]

56. On November 27, 2023, Plaintiff submitted a complaint to the U.S. Equal Employment

---

[5] Dr. Adil Ali, "Alphabet's Verily is the future of precision and public health," *Fortune*, November 20, 2024 (available at https://www.onyxnewsroom.com/alphabets-verily-is-the-future-of-precision-and-public-health/).

[6] Sanofi disclosed the purchase price in its December 31, 2022 filing with the Securities and Exchange Commission. *See* Sanofi Form 20-F For the fiscal year ended December 31, 2022, at F-47, "Unquoted equity investments," (*available at* https://www.sec.gov/Archives/edgar/data/1121404/000112140423000008/sny-20221231.htm).

Opportunity Commission ("EEOC") asserting associational discrimination.

57. On March 26, 2024, Plaintiff and Defendant participated in an unsuccessful mediation session facilitated by the EEOC. On July 31, 2024, EEOC District Director Nancy A. Sienko provided Plaintiff a right to sue letter.

58. Defendant wrongfully retaliated against Plaintiff for being a whistleblower by terminating his employment and without considering him for another role and offering the position to a less qualified candidate, a colleague who Verily's leadership deemed unlikely ▮▮▮▮▮▮▮▮▮▮ Defendant also interfered with Plaintiff's protected leave under the Family Medical Leave Act and improperly denied his benefits under the FMLA.

59. Defendant additionally retaliated against Plaintiff by demanding repayment of his 2022 earned bonus. Plaintiff's 2022 Sales Memorandum outlined his bonus plan and set his "target bonus" at 100% of his base salary of $360,000. Pursuant to his 2022 Sales Memorandum, in March 2023, Defendant paid Plaintiff three sales incentive bonus payments: $6,545.21 on March 9; $176,697 on March 10; and $183,240.21 on March 31, 2023.

60. On April 13, 2023, Defendant emailed Plaintiff to assert that the third payment was in error. Defendant instructed that the Google Overpayments and Payroll Teams would contact Plaintiff "shortly" to request repayment. Plaintiff did not hear from either Defendant or Google "shortly."

61. Defendant's April 7, 2023 draft separation agreement mischaracterized the third (and largest) payment as an overpayment but also acknowledged that it was an earned incentive payment. At most, Defendant overpaid by $6,482.42, the amount over Plaintiff's base salary.

62. Defendant received Plaintiff's EEOC complaint on December 6, 2023; just ***fourteen days later***, on or about December 20, 2023, Defendant, through then-counsel, demanded repayment of the largest of the three bonus payments, in an amount of $183,240.21. Thus, it was not until Defendant learned that Plaintiff was asserting his rights that Defendant sought repayment.

63. On or about August 5, 2024, Plaintiff finally received a communication directly from the Google Overpayments Team, seeking repayment of the third net bonus payment he received in March 2023. One hour and three minutes later, Plaintiff received a second email from Google, stating "Please disregard this email. During a cleanup effort, this email was unintentionally issued. We apologize for the

1  confusion. Regards, Google Overpayments Team."

2  64. On or about October 29, 2024, Plaintiff filed the instant action. A day after its agent for
3  service was served with the action, on or about November 15, 2024, Defendant, through present counsel,
4  threatened legal action for the alleged overpayment that Google had told Plaintiff to disregard.

## FIRST CAUSE OF ACTION

*Whistleblower Retaliation*

(Cal. Labor Code § 1102.5)

65. Plaintiff re-alleges and incorporates all preceding paragraphs of this complaint by reference as if fully set forth herein.

66. At all times herein mentioned, California Labor Code section 1102.5 was in full force and effect and was fully binding upon Defendant. California Labor Code section 1102.5 prohibits employers from retaliating against an employee who engages in protected activity, including but not limited to reporting illegal conduct occurring within the employer company.

67. At all relevant times, Defendant was an employer as defined by California law. At all relevant times, Plaintiff was Defendant's employee.

68. Plaintiff complained that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Plaintiff's concerns were largely ignored by his manager.

69. Defendant's acts and omissions, including terminating Plaintiff's employment, constitute unlawful retaliation after Plaintiff reported ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

70. Defendant further retaliated against Plaintiff by demanding repayment of his earned bonus just fourteen days after receiving his EEOC complaint.

71. As a direct, foreseeable, and proximate result of Defendant's retaliatory actions, Plaintiff has suffered and continues to suffer economic damages that include, without limitation, loss of wages, salary, benefits and/or additional amounts of money he would have received but for Defendant's unlawful actions as alleged herein, in amounts subject to proof.

72. Further, due to the termination of his employment, Plaintiff has experienced severe mental

health issues, including depression and anxiety. These conditions have been diagnosed by medical professionals, who have subsequently prescribed appropriate medication to manage these symptoms.

73. The harm to Plaintiff was "physical" in the sense that it affected his emotional and mental health, rather than being a purely economic harm. *State Farm Mutual Automobile Ins. Co. v. Campbell* (2003) 538 U.S. 408, 419. It was objectively reasonable to assume that Defendant's conduct towards Plaintiff would affect his emotional well-being, and therefore Defendant's "conduct evinced an indifference to or a reckless disregard of the health or safety of others." Plaintiff was an employee who relied on his regular paycheck to survive and therefore it appears he "had financial vulnerability." *Roby v. McKesson* (2009) 47 Cal.4th 686.

74. The above-described actions were perpetrated and/or ratified by managing agents, officers or directors of Defendant. These acts were done with malice, fraud, oppression, and in reckless disregard of Plaintiff's rights. Such acts were despicable in character and warrant the imposition of punitive damages within the meaning of California Civil Code section 3294 and in a sum sufficient to punish and deter Defendant's future conduct.

75. Under California Labor Code section 1102.5, Plaintiff is entitled to an award of reasonable attorney's fees, costs, and prejudgment interest.

## SECOND CAUSE OF ACTION

*Retaliation in Violation of Title VII*

(42 U.S.C. § 2000e-3(a))

76. Plaintiff re-alleges and incorporates all preceding paragraphs of this complaint by reference as if fully set forth herein.

77. Title VII of the Civil Rights Act of 1964 prohibits retaliation against ""any individual...because has made a charge, testified, assisted, or participated in any manner in any investigation, proceeding, or hearing under this subchapter. 42 U.S.C. § 2000e-3(a).

78. Defendant received Plaintiff's EEOC complaint on or about December 6, 2023. On or about December 20, 2023, Defendant demanded that Plaintiff repay a significant portion of his already-earned bonus.

79. On August 5, 2024, Google demanded repayment and then almost immediately told Plaintiff to disregard its overpayment communication. Nonetheless, after this action was filed,

Defendant's counsel demanded repayment.

80. Defendant's conduct is malicious or recklessly indifferent to Plaintiff's federally protected rights. 41 U.S.C. § 1981a(b)(1).

81. As a result of Defendant's retaliatory conduct, Plaintiff is entitled to compensatory and punitive damages.

## THIRD CAUSE OF ACTION

*Interference with FMLA Rights*

(29 U.S.C. § 2614)

82. Plaintiff re-alleges and incorporates all preceding paragraphs by reference as if fully set forth herein.

83. At all times herein mentioned, the Family Medical Leave Act, 29 U.S.C. § 2614, was in full force and effect and was fully binding upon Defendant. The FMLA creates two interrelated, substantive employee rights: first, the employee has a right to use a certain amount of leave for protected reasons, and second, the employee has a right to return to his or her job or an equivalent job after using protected leave.

84. At all relevant times, Defendant was an employer as defined by the FMLA. At all relevant times, Plaintiff was Defendant's employee.

85. Plaintiff was eligible for FMLA leave and Defendant was covered by the FMLA.

86. Plaintiff was entitled to leave under the FMLA and provided sufficient notice of his intent to take leave.

87. Defendant violated Plaintiff's FMLA rights by denying his eligibility while he was on leave, after a supervisor approved his leave from December 6, 2022 to February 27, 2023. Defendant furthermore required Plaintiff to work while on approved FMLA leave, in violation of US Department of Labor laws.

88. Further, Plaintiff received notice that his role was being eliminated on January 11, 2023. Defendant violated Plaintiff's rights under the FMLA by interfering with his leave and refusing to return him to his position (or a comparable position) after his leave ended.

89. As a direct, foreseeable, and proximate result of Defendant's unlawful actions, Plaintiff

has suffered and continues to suffer economic damages that include, without limitation, loss of wages, salary, benefits and/or additional amounts of money he would have received but for Defendant's discriminatory actions as alleged herein, in amounts subject to proof.

**FOURTH CAUSE OF ACTION**

*ADA Associational Discrimination*

(42 U.S.C. § 12112(b)(4))

90. Plaintiff re-alleges and incorporates all preceding paragraphs of this complaint by reference as if fully set forth herein.

91. Title I of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12111, *et seq.,* and its implementing regulation, 29 C.F.R. Part 1630, requires covered employers, such as Defendant, to provide reasonable accommodations to otherwise qualified employees who are known to have a relationship or association with a disabled person.

92. Reasonable accommodation includes, but is not limited to, authorizing a change in the start date of termination benefits for an employee out on protected leave.

93. Plaintiff is an otherwise qualified individual who is known to be closely related to someone with a life-impairing disability, namely his mother. As stated above, Plaintiff notified Defendant of his mother's disability and requested to have his RIF benefits delayed until he was able to return to work and utilize them.

94. Defendant flatly refused Plaintiff's request, claiming that Plaintiff was not on protected leave as of January 11, 2023, despite him having received approval for his protected leave on December 6, 2022.

95. Defendant's conduct as described in this complaint constitutes discrimination on the basis of disability in violation of Title I of ADA, 42 U.S.C. § 12111, *et seq.,* and its implementing regulation, 29 C.F.R. Part 1630.

96. As a result of Defendant's discriminatory conduct, Plaintiff suffered and continues to suffer damages.

///

///

## FIFTH CAUSE OF ACTION

*FEHA Associational Discrimination*

(Cal. Gov. Code § 12900 *et seq*.)

97. Plaintiff re-alleges and incorporates all preceding paragraphs by reference as if fully set forth herein.

98. California Government Code sections 12900 *et seq*. requires covered employers, such as Defendant, to provide reasonable accommodations to otherwise qualified employees who are known to have a relationship or association with a disabled person.

99. Reasonable accommodation includes, but is not limited to, authorizing a change in the start date of termination benefits for an employee out on protected leave.

100. Plaintiff is an otherwise qualified individual who is known to be closely related to someone with a life-impairing disability, namely his mother. As stated above, Plaintiff notified Defendant of his mother's disability and requested to have his RIF benefits delayed until he was able to return to work and utilize them.

101. Defendant flatly refused Plaintiff's request, claiming that Plaintiff was not on protected leave as of January 11, 2023, despite him having received approval for his protected leave on December 6, 2022.

102. Defendant's conduct as described in this complaint constitutes discrimination on the basis of disability in violation of California Government Code sections 12900, *et seq*.

103. As a result of Defendant's discriminatory conduct, Plaintiff suffered and continues to suffer damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, prays for judgment against Defendant as follows:

A. An award for actual and compensatory damages, including lost wages, earnings, employee benefits, liquidated damages, and all other sums of money together with interest on these amounts and according to proof;

B. For punitive damages;

C. For emotional damages;

D. For general, special, and incidental damages according to proof;

E. Pre-judgment and post-judgment interest, as provided by law;

F. Attorneys' fees and costs under applicable law, including expert fees and costs; and

G. Such additional and further relief as this forum may deem just and proper.

ADDITIONALLY, Plaintiff demands trial of this matter by jury. The amount demanded exceeds $75,000.00.

Dated: December 18, 2024                                THE OTTINGER FIRM, P.C.

*Robert W. Ottinger*

Robert W. Ottinger