Robert W. Ottinger (SBN 156825)
Melanie L. Proctor (SBN 228971)
**THE OTTINGER FIRM, P.C.**
2108 N Street, Suite N
Sacramento, CA 95816
Tel: 415-262-0096
Fax: 212-571-0505
robert@ottingerlaw.com
melanie@ottingerlaw.com

*Attorneys for Plaintiff*
RYAN SLOAN

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| RYAN SLOAN,<br><br>Plaintiff,<br><br>vs.<br><br>VERILY LIFE SCIENCES, LLC, a Delaware Limited liability company,<br><br>Defendant. | **Civil Action No.: 24-cv-07516-EMC**<br><br>**SECOND AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL** |

Plaintiff, Ryan Sloan, by and through his attorneys, The Ottinger Firm, P.C., complaining of Defendant, VERILY LIFE SCIENCES, LLC, alleges as follows:

## **INTRODUCTION**

1.     Plaintiff Ryan Sloan ("Plaintiff" or "Mr. Sloan") was employed as the Chief Commercial Officer for Onduo, a healthcare provider subsidiary of Verily Life Sciences, LLC ("Defendant" or "Verily"). At all times relevant to this matter, Verily is and was Alphabet Inc.'s research organization that specializes in health technology with a primary focus on clinical research, care, and health financing. Mr. Sloan's employment with Verily began on September 28, 2020.

2.      Plaintiff Ryan Sloan brings this action pursuant to the Americans with Disabilities Act of 1990, as codified, 42 U.S.C. §§ 12112 to 12117 and 42 U.S.C. § 2000e-3(a), retaliation for making an Equal Employment Opportunity Commission charge. Plaintiff also asserts a breach of contract claim.

3.      Defendant wrongfully retaliated against Plaintiff, in violation of Defendant's own anti-retaliation policy, after Plaintiff reported a series of HIPAA breaches concerning Defendant's unauthorized use of Protected Health Information in connection with Verily's research, marketing campaigns, press releases, and national conferences. Plaintiff, as contractually required by his Employment Agreement and Verily's Code of Conduct, expressed these concerns to Verily senior management on several occasions between January 2022 and November 2022, as Plaintiff believed Defendant had a duty under the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") to disclose the multiple breaches and undertake remedial action as provided by relevant statutes and regulations.

4.      In November 2022, Quest Diagnostics announced results from an independent study it had conducted on the clinical efficacy of the Verily's Onduo Diabetes program.[1] Because the Quest announcement did not violate HIPAA, Plaintiff coordinated with Verily's press office to issue a press release. But Defendant suppressed it so Defendant and its parent company could continue to conceal the HIPAA breaches. Plaintiff continued to protest the HIPAA violations and request that impacted entities receive statutorily-required notices. One week after the suppression of the press release, Plaintiff was notified of his termination under false pretext that his position would be eliminated, when in fact it was given to a less-qualified individual.

5.      Furthermore, at the time of the Reduction in Force ("RIF") through which Defendant terminated Plaintiff's employment, Plaintiff was on protected leave caring for his disabled and critically ill mother. Defendant had initially denied Plaintiff's first leave request, and then required Plaintiff to perform work during leave. Defendant also failed to pay Plaintiff at a rate equivalent to other paid leaves, in violation of Defendant's own paid leave policy.

---

[1] Zhen Chen, Charles E. Birse, Maren Fragala, Michael Mcphaul, and Lance Bare, "Independent Evaluation of Effects of a Virtual Employer-Sponsored Type 2 Diabetes Management Program on Blood Glucose," American Heart Association, Scientific Sessions 2022, https://www.abstractsonline.com/pp8/?&_ga=2.176809638.28652446.1667228577-1783648661.1667228577#!/10611/presentation/13013, Nov. 6, 2022.

6.      As further retaliation for his whistleblowing activity, Defendant refused to honor his request to adjust the termination benefit start date to accommodate his leave: namely, Plaintiff requested that Defendant delay the start of his 60-day benefit period under the RIF until his return from protected leave, *an accommodation given to other impacted employees*. Plaintiff requested this to receive the 60 days of internal transition networking and external job search assistance that the other RIF terminated employees received. But Defendant summarily denied Plaintiff's request.

7.      Defendant also retaliated against Plaintiff after he filed a Charge Letter with EEOC by demanding repayment of half of his 100% target bonus. Defendant treated Plaintiff differently from at least three similarly situated former employees, because until March 2025, Defendant demanded repayment of an alleged overpayment only from Plaintiff. Moreover, Defendant lacked legal basis to seek recovery of alleged overpayment of Plaintiff's Target Bonus, which Plaintiff was contractually due.

## STATEMENT PURSUANT TO LOCAL RULE 9

8.      For purposes of complying with Local Rule 9, Plaintiff states that he has no corporate parent, subsidiary, or affiliate and that there are no other interested parties.

## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction under 28 U.S.C. § 1331, 28 U.S.C. § 1332, and 29 U.S.C. § 2617(a)(2).

10.     Complete diversity of citizenship exists because Plaintiff is a resident of Georgia and Defendant is incorporated in Delaware, with its headquarters in Texas. The amount in controversy exceeds $75,000.

11.     Venue is proper in the Northern District of California under 28 U.S.C. § 1391(b)(2) as the acts and omissions giving rise to these claims occurred within this district, at the time the events giving rise to Plaintiff's claims occurred Defendant was headquartered in this district, and Defendant conducts substantial business within this district. Defendant moved from California to Texas ***only after*** the incidents at issue in this matter occurred.

12.     Defendant is a corporate entity with a workforce of over 100 employees. Defendant is a person within the meaning of 42 U.S.C. § 12111(7) and 29 U.S.C. § 2611(4).

13.     Defendant is an employer within the meaning of 42 U.S.C. § 12111(5), and a covered entity within the meaning of 42 U.S.C. § 12111(2) and 29 C.F.R. § 1630.2.

14.     Plaintiff has exhausted his administrative remedies by receiving a Right to Sue letter from the Equal Employment Opportunity Commission on July 31, 2024.

15.     The decisions and conduct at issue in this case occurred primarily in South San Francisco where Defendant was based at that time. The primary actors such as the head of Human Resources, the CEO and General Counsel and others were all based in California.

## PARTIES

16.     Plaintiff is currently a resident of Georgia.  At all times mentioned herein, Plaintiff was a resident of Georgia working remotely for a California based company and connecting to California based offices where his supervisors were headquartered in California at that time.

17.     Plaintiff is an individual who resides in Marietta, Georgia. At all relevant times, Plaintiff was employed by Verily under an agreement governed by California law, Plaintiff worked remotely in a California-based role during his tenure, and Plaintiff met the definition of an "employee" under applicable statutes, laws, and regulations. At all times mentioned herein Verily's corporate headquarters was located in South San Francisco, California.

18.     Plaintiff is represented in this case by The Ottinger Firm, P.C.

19.     Defendant is a Delaware Limited liability company that was and still is a corporation engaged in medical component servicing and research.  Defendant is organized under the laws of the State of Delaware and its headquarters is located at 2999 Olympus Blvd, Ste 1000, Dallas, Texas 75019 only as of the end of Q3 2024.[2] Prior to that date, it was headquartered in South San Francisco, California.

20.     At all relevant times, Defendant had and still has at least fifty employees working within this district, and this is the district in which the events took place.

21.     Verily is a limited liability company organized and existing under the laws of the state of Delaware, with their principal place of business now in Texas, and operating in California with several

---

[2] Noor Adatia, "Alphabet company Verily moving headquarters from California to North Texas," *Dallas Business Journal*, July 24, 2024 (*available at* https://www.wfaa.com/article/money/business/alphabet-company-verily-moving-headquarters-dfw/287-382d650a-d293-4adc-a762-8d96478256f1#:~:text=San%20Francisco%2Dbased%20Verily%20Life,Dallas%20office%20in%20June%202022).

offices throughout the United States. Verily maintains a registered agent in California. As of December 11, 2024, its website still states that it is "anchored in the epicenter of biotech---San Francisco Bay Area, California."[3] Only 60 of Verily's 1,400 employees work at Verily's Dallas office.[4] At all relevant times, Verily met the definition of "employer" under applicable statutes, laws, and regulations.

## FACTS

### Mr. Sloan Is Recruited to Onduo

22.     In March of 2017, Mr. Sloan was contacted by Defendant to discuss a Retinal Camera Program that Verily was developing.  Verily's outreach to Mr. Sloan occurred after media coverage of an innovative camera he developed to detect diabetic retinopathy. In May of 2017, Plaintiff participated in several meetings at Defendant's headquarters where Verily discussed their Retinal Camera Program. Thereafter, on or about December 11, 2017, Plaintiff and four (4) Verily employees worked together on a joint pilot program for a Texas Health Insurer called Superior Health.

23.     On April 7, 2020, Defendant offered Mr. Sloan an executive position at Onduo, a subsidiary of Verily.  Defendant offered Mr. Sloan a substantial compensation package which included a $200,000 signing bonus to induce Mr. Sloan to resign from his then-current employer, Vitality Group International.

24.     Plaintiff accepted Defendant's offer and began his tenure as Chief Commercial Officer of Onduo on September 28, 2020.

25.     Page 9 of the Verily Code of Conduct boldly states that "VERILY PROHIBITS RETALIATION of any kind against anyone who reports concerns in good faith." On page 9, Verily defines good faith as "[s]haring a concern in good faith means that you honestly suspect there is a violation of our Code, our policies, or the law, and that you are not deliberately making a false report." Further on page 9, retaliation is defined as "[a]n adverse action that can take various forms, such as threats, mistreatment, harassment, negative performance reviews, demotion, suspension, reduced compensation, denial of benefits, or termination."

---

[3] "Careers," *Verily* (*available at* https://verily.com/about-us/careers [visited December 11, 2024].)
[4] Adatia, "Alphabet company Verily moving headquarters from California to North Texas."

26.     On page 15 of the Verily Code of Conduct, Verily emphasizes compliance with HIPAA Business Associate Agreements: "When individuals give their personal health information to us, they should understand how it will be used and how it will be protected. If we fail to do that, then we are putting them, ourselves, our business partners, and colleagues we work with at risk."

**Mr. Sloan Establishes an Early Track Record of Success as Onduo's Chief Commercial Officer**

27.     Plaintiff delivered strong performance and demonstrated impact as soon as he joined Verily. For example, in his first six (6) months of employment, Plaintiff built the following functional capabilities within Onduo, where none had existed before: a sales and marketing organization, and Verily's first true sales team. After standing up these functions, Plaintiff developed and led implementation within them of new business processes including Sales Commissions, Quotas, and Sales Pipeline Forecasting. Mr. Sloan's performance met or exceeded his 2020 incentive goals, and he received 100% of the eligible award and a 2.85% salary adjustment according to Defendant's incentive program.

28.     Plaintiff continued to drive success for Verily in 2021, his first full year with Defendant's organization. That year, Mr. Sloan led the Onduo business to successfully reach an aggressive Sales Bookings target: the team Mr. Sloan led originated and signed Verily to a 6-year agreement with Highmark Health, a large health plan with around 6,000,000 members. The Highmark Health deal generated the highest revenue of any Verily contract in 2021. Led by Verily CEO Stephen Gilette, the Onduo Board awarded Plaintiff his 2021 bonus "at Target", with an overall bonus above 100% of his base salary.

29.     As Chief Commercial Officer, Plaintiff also met regularly with the Verily Retinal Camera product team, and helped develop the core framework of its planned commercial offering and go-to-market strategy.   In November of 2021, Plaintiff, using his network, cultivated and secured the commitment of Superior Health to be the first health plan associated with the Retinal Camera program.

30.     Impressed with Onduo's growth potential, in March of 2022 Verily decided to fully integrate the Onduo subsidiary into its operations. In April of 2022, Verily offered Plaintiff a new compensation structure with another 2.85% base salary adjustment as well as $225,250 in one-time discretionary payments to ensure that Mr. Sloan did not have any gaps in receiving his due bonuses.

31.     Verily Chief People Officer Kerrie Peraino signed the offer, which stated "[t]his offer, together with Exhibits A & B and your previously signed Onduo LLC Restrictive Covenant Agreement

1 . . . is the complete agreement regarding the terms and conditions discussed herein and will supersede and

2 replace any prior agreements (written or oral) between you and Verily and/or you and the Company with

3 respect to or in connection with your employment with Verily and/or the Company." Plaintiff accepted

4 the offer on or about April 19, 2022, thus entering an Employment Agreement with Verily.

5       32.    The Employment Agreement states at section 9 that by signing, Plaintiff "underst[oo]d that

6 Verily maintains an Employee Handbook and a Code of Conduct," and that Plaintiff would "agree to read,

7 understand and comply with the policies set forth or incorporated into the Verily Employee Handbook

8 and Code of Conduct."

9       33.    The Verily Code of Conduct states in a bold text box that "VERILY PROHIBITS

10 RETALIATION of any kind against anyone who reports concerns in good faith." On April 25, 2022,

11 Plaintiff transitioned formal employment with Verily and was assigned to report to a new supervisor:

12 Verily Chief Revenue Officer Lisa Greenbaum.

13       34.    In June of 2022, Plaintiff had his first performance review with Ms. Greenbaum, which

14 was enthusiastic and positive. During this review meeting, Ms. Greenbaum communicated that Mr.

15 Sloan's reputation and status continued to rise at Verily, and she asked if Mr. Sloan would be willing to

16 assume a full business leadership role for the Verily Retinal Camera program in 2023. In the same meeting,

17 Mr. Sloan expressed his strong interest in accepting this elevation of his responsibilities, seeing it as a

18 natural and sought-for career progression, given his historical contributions to the success of the Retinal

19 Camera program and prior experience in that sector.

20       **Mr. Sloan Discovers and Reports Verily's HIPAA Breaches**

21       35.    In January of 2022, Plaintiff and Julia Feldman, Onduo General Counsel, uncovered

22 extensive violations by Verily of Protected Health Information ("PHI") from over 25,000 patients of its

23 Onduo Diabetes Program.  Plaintiff and Ms. Feldman followed instructions outlined on page 15 of Verily's

24 Code of Conduct by escalating the concern to Verily's Chief Privacy Officer, Kim Richardson, and

25 Verily's General Counsel and Board Secretary, Cynthia Patton. Mr. Sloan and Ms. Feldman made these

26 reports, as required under Verily policy, by written communications to the above-named colleagues in

27 messages sent over their employer's email and direct message accounts.

28       36.    Between January and March of 2022, internal investigators at Verily confirmed multiple

7

breaches of fourteen (14) separate HIPAA Business Associate Agreements with large, covered entity clients of Onduo between 2017 and 2021. The Business Associate Agreements strictly forbade Verily's use of Protected Health Information outside of direct patient care, but Verily had failed to maintain adequate internal controls.

37.    Defendant required employees, including Plaintiff, to undertake annual HIPAA compliance training, and to attest to compliance with reporting of violations of law. As noted above, page 15 of Verily's Code of Conduct states the importance of complying with Data Privacy: "When individuals give their personal health information to us, they should understand how it will be used and how it will be protected. If we fail to do that, then we are putting them, ourselves, our business partners, and colleagues we work with at risk." Verily's Code of Conduct had been clearly violated through unconsented use of patient Protected Health Information for non-permitted purposes, namely use of protected information for marketing, internal research, and development of Artificial Intelligence tools.

38.    The Business Associate Agreements were contracted with each of the following entities that sponsored Diabetes Management programs, provided by Verily Onduo, for patients covered under their medical benefit program: the Federal Employee Benefit Program (Onduo was offered to federal government employees in Georgia and Arkansas through partnership with the Blue Cross Blue Shield Association), Walgreens Boots Alliance, Highmark Health, State of Indiana (through Anthem, now Elevance Health), CareFirst Blue Cross Blue Shield, H.E.B. Grocery, Quest Diagnostics, Delta Airlines (through ShareCare), John Hancock Life Insurance, MGM Resorts, Sentara Health Plans, Commonwealth of Massachusetts (through Tufts Health Plan), Blue Cross Blue Shield of Arkansas, Blue Cross Blue Shield of South Carolina, and New Hampshire State Medicaid (through Centene). These partnerships were publicly disclosed.[5]

---

[5] For example, Verily Onduo announced its partnership with Walgreens Boots Alliance. "*Walgreens Boots Alliance and Verily Announce Strategic Partnership to Innovate on New Solutions to Improve Health Outcomes*," Dec. 19, 2018 (available at https://verily.com/perspectives/walgreens-boots-alliance-and-verily-announce-strategic-partnership-to-innovate-on-new-solutions-to-improve-health-outcomes. Verily disclosed its partnership with Blue Cross Blue Shield of Arkansas and Georgia and life insurer John Hancock. "Onduo and scaling the virtual care model," Dec. 11, 2019 (available at https://verily.com/perspectives/onduo-and-scaling-the-virtual-care-model. And, Verily announced its ""Healthy at Work" partners include the publicly-traded Quest Diagnostics and Fulgent Genetics. "Verily Announces New Customers and Partners for its Healthy at Work Program," July 30, 2020 (available at https://verily.com/perspectives/verily-announces-new-customers-and-partners-for-its-healthy-at-work-program). Verily also disclosed its engagement with Highmark Health. "Highmark Health engages Verily to reinvent the

39.    Pursuant to the HIPAA Breach Notification Rule, 45 C.F.R. §§ 164.400-414, a business associate must provide notice to the covered entity without unreasonable delay, and *no later than* 60 days from the discovery of the breach. As Ms. Feldman and Plaintiff had made their discovery in January 2022 – based on his understanding and Ms. Feldman's legal point of view shared with him – Plaintiff concluded that Verily's obligation to disclose was no later than end of March 2022.

40.    As Chief Commercial Officer of Onduo, Plaintiff was responsible for all external client communications. In March 2022, Plaintiff and Ms. Feldman informed the Onduo Board, which included Verily CEO Stephen Gillette and Verily Chairman Andy Conrad, of the HIPAA breaches.

41.    Plaintiff, in conjunction with Ms. Feldman, repeatedly raised the issue with Verily's executives during Board meetings and other forums. Ultimately, however, Defendant decided to delay the decision of notifying the covered entities, despite the 60-day notification requirement pursuant HIPAA regulations.

42.    In June of 2022, Ms. Greenbaum relayed a business decision to Plaintiff's team to seek new Business Associate Agreements with terms that would prospectively permit future research with impacted clients, and to do so without disclosing that certain of these covered entities' PHI ***had already been used*** in violation of existing Business Associate Agreements which governed Verily's conduct from 2017 to 2021. Although the communication from Ms. Greenbaum included legal team members, the instructions for the scope of the new Business Associate Agreements were not made while seeking legal advice.

43.    Throughout 2022, Verily engaged in negotiations to renew amended Business Associate Agreements, with many of the already-impacted Business Associates, without revealing that a HIPAA breach had recently occurred. For example, in June of 2022, Verily executed an attestation with Walgreens Boots Alliance stating – inaccurately – that all Walgreens Employee health information held by Verily had been used in compliance with their Business Associate Agreement, when in actuality the employee health information had been inappropriately used in marketing materials. Similarly, during a contract negotiation between Verily and Highmark Health in August of 2022, Verily represented that it was in

healthcare experience for Highmark Health customers and clinicians," March 2, 2021 (available at https://verily.com/perspectives/highmark-health-engages-verily-to-reinvent-the-healthcare-experience-for-highmark-health-customers-and-clinicians).

compliance with HIPAA at all times, while knowingly concealing that a HIPAA breach had occurred.

44.     On August 17, 2022, Verily abruptly terminated two (2) of Plaintiff's closest colleagues who were most knowledgeable of the HIPAA breaches: Julia Feldman (Onduo General Counsel), who first discovered the breaches with Plaintiff, and Allison Orenstein (Onduo VP of Marketing), who raised awareness about the extent of press releases, sales presentations, and external marketing publications conducted with information used in violation of HIPAA.

45.     Throughout September and October 2022, in weekly workgroup meetings with senior managers, and in a data rights document which tracked the HIPAA violations, Plaintiff continued to advocate for ethical resolution of illegal activity and sought permission from Lisa Greenbaum to notify the impacted Business Associates. Plaintiff vehemently disagreed with Verily's decision to conceal the multiple breaches, which Verily justified with what Plaintiff saw as a fraudulent risk determination made eight (8) months after discovery of the breaches, with the only remedial action being the removal of certain published research from Verily's website (but not from external articles, press releases, nor publications in clinical journals). Mr. Sloan remained gravely concerned that colleagues close to these discoveries and initial reporting, Ms. Feldman and Ms. Orenstein, had been terminated.

46.     On October 12, 2022, during a sales training meeting in Dallas on Verily's new Precision Health messaging, Mr. Sloan again discussed his concerns with his boss, Ms. Greenbaum, about the urgency of notifying impacted Business Associates as required by HIPAA, as well as his concerns about the ethics of Verily's presenting a research and health information-focused sales campaign to the very same Business Associates who had unknowingly suffered HIPAA breaches when they last shared PHI with Verily. Mr. Sloan's concerns were ignored, and Ms. Greenbaum defended her decision not to disclose the breaches, stating that to disclose would negatively affect public relations.

47.     In late October 2022, Plaintiff was approached by representatives from Quest Diagnostics, a Verily client who offered the Onduo Diabetes program to their covered employees. Researchers at Quest Diagnostics had performed an independent study of the clinical efficacy of the Verily's Onduo Diabetes program and planned to announce highly favorable clinical results on November 6, 2022 at the American Heart Association (AHA) Scientific Sessions.

48.     Plaintiff contacted Verily's Public Relations Manager Jessica (Jess) Ayers to initiate a

press release. Prior to release, Plaintiff and Ms. Ayers received confirmation that the patient data was obtained independently from Verily *and was used with proper consent*. A copy of the November 6, 2022 press release can be viewed at: https://www.businesswire.com/news/home/20221106005007/en/New-Data-Show-Onduo-by-Verily-Significantly-Improves-Glycemic-Levels-Among-Employees-Living-with-Type-2-Diabetes-at-American-Heart-Associations-Scientific-Sessions-2022.

49.     The November 6, 2022 Press Release generated highly favorable media coverage for Verily. "Verily may have hit the jackpot with its Onduo virtual care platform" https://www.fiercebiotech.com/medtech/aha-verilys-onduo-virtual-care-app-improves-glucose-cholesterol-type-2-diabetes-patients. "Verily's Digital Health Platform Shows Promise for Diabetes" https://www.mddionline.com/diabetes/verily-s-digital-health-platform-shows-promise-for-diabetes. "Verily's Onduo cut blood sugar in retrospective study of Type 2 diabetics" https://www.medtechdive.com/news/verily-GOOGLE-onduo-blood-sugar-type-2-diabetes/635995/.

50.     Despite highly favorable publicity for Defendant, senior executives at Verily and its parent company Alphabet became concerned that media attention toward the independent clinical study would draw attention to previous marketing studies performed by Verily in breach of Business Associate Agreements from Quest Diagnostics and other clients. At 11:32 a.m. on November 7, 2022, Plaintiff received a text message from Ms. Greenbaum asking "Did you know about the abstract at AHA? Is that "approved" data?" Plaintiff confirmed he initiated the press release with Ms. Ayers, and understood that by "approved" data Ms. Greenbaum was referencing information that was not in violation of Business Associate Agreements. Ms. Greenbaum expressed surprise at the level of concern and confirmation of involvement of executives at Alphabet, stating "We make things so hard – I know we are Alphabet, but I have never faced this for a blinded case study." Plaintiff replied that he was appealing the request from senior management to suppress mention of the study, stating "Yep. Sending a note now" and "You would think this would be on our website, etc."

51.     Shortly after the text exchange with Ms. Greenbaum, Plaintiff joined a conference call with Verily executives discussing their order to suppress the press release. Plaintiff was ordered to stop all promotion of the press release to avoid exposing prior violations of Business Associate Agreements. Plaintiff openly countered with his support for promotion of the study and use of the press release on

1  Verily's website, and proposed that Verily instead notify its customers, beginning with Quest Diagnostics,

2  of the previous violations. Plaintiff was surprised that no other individuals on the call spoke in support of

3  his position to notify impacted customers.

4       52.    Alphabet, Inc./Google executives had motive to conceal exposure of violations of Business

5  Associate Agreements because the company's access to and use of sensitive medical information was

6  already subject to scrutiny.  See Rob Copeland, "Google's 'Project Nightingale' Triggers Federal

7  Inquiry," *Wall Street Journal* (https://www.wsj.com/articles/behind-googles-project-nightingale-a-

8  health-data-gold-mine-of-50-million-patients-11573571867), Nov. 12, 2019; Nathan Eddy, "Project

9  Nightingale seems to square with HIPAA, but next steps matter," *Healthcare IT News*

10  (https://www.healthcareitnews.com/news/project-nightingale-seems-square-hipaa-next-steps-matter),

11  Nov. 13, 2019.

12       53.    Furthermore, in a letter addressed to five U.S. senators in April 2020, Verily's CEO had

13  promised future compliance with Business Associate Agreements (BAA) and HIPAA. Hugh Langley,

14  "Verily told 5 US senators that it has run more than 7,000 tests for COVID-19 and plans to keep the

15  mandatory Google sign-in," *Business Insider* (https://www.businessinsider.com/verily-has-completed-

16  more-than-7000-covid-19-tests-2020-4), Apr. 14, 2020 (quoting Andy Conrad's letter to senators, stating

17  "in the future if we engage in a program where we do become a covered entity or we are required to sign

18  a BAA we will take all the appropriate steps to ensure compliance with HIPAA.").

19       54.    Plaintiff's stance of good faith compliance with HIPAA and Verily's Code of Conduct put

20  him at odds with illicit business interests. Plaintiff represented a liability to Verily and Alphabet's

21  concealment of HIPAA violations. Defendant removed the November 6, 2022 press release from its

22  website, and directed sales and marketing teams not to mention the independent study performed by Quest

23  Diagnostics, despite favorable promotion of Verily's Diabetes Program.

24       55.    At that time, Ms. Greenbaum was lobbying internally at Verily for a promotion for herself

25  and chose to align with Verily senior managers in concealing the illegal activity. Ms. Greenbaum's career

26  aspirations were at odds with Plaintiff's desire to notify clients and key stakeholders of the health

27  information breaches committed during Verily's prior research.

28  ///

**Mr. Sloan Is Targeted for Termination from Verily**

56.     On November 14, 2022, one week after their text message exchange regarding the suppressed press release, Plaintiff met with Ms. Greenbaum at a sales conference in Las Vegas. Ms. Greenbaum informed Plaintiff that a company reorganization was planned where Ms. Greenbaum would be promoted to Chief Commercial Officer. She then told Mr. Sloan that the Verily Onduo business and the Medical Devices business would be "deprioritized," with all projects being stopped except for the Retinal Camera program, which Plaintiff had worked on since 2017.  She told Plaintiff his position would be eliminated, and he would be replaced by a less experienced colleague (the replacement she identified was Level 6, while Mr. Sloan was Level 8). Plaintiff was shocked, as his performance feedback from Ms. Greenbaum and his prior manager Vindell Washington had been, until that time, uniformly positive.

57.     In ending that November 14, 2022, conversation, Ms. Greenbaum verbally promised to fund Plaintiff's 2022 bonus "at target" and indicated to Mr. Sloan that company-wide decisions about the Onduo "deprioritization" were still underway and would not be finalized until January 2023.

58.     After his conversation with Ms. Greenbaum, Plaintiff continued his work and spoke to other colleagues about possible alternative roles at Verily. In the course of ordinary duties, during this period Plaintiff was also added to a Trusted Insiders list, and given classified information, in accordance with the shared expectation that he would have an ongoing role within Verily or another division of Alphabet Inc.

**Mr. Sloan Takes Protected Leave to Care for His Disabled Mother**

59.     On November 30, 2022, Plaintiff received an urgent call that his mother was rushed to the emergency room with seizures from a previously undetected cancer in her brain. His mother was in a coma and would require emergency brain surgery. Plaintiff was the only family member in the area, and he held the Medical Power of Attorney for his mother's healthcare decisions.

60.     On December 6, 2022, Plaintiff requested a leave of absence under the Family Medical Leave Act to care for his mother. On December 19, 2022, Plaintiff received a letter acknowledging his Carer's leave (pursuant to Defendant's policy) beginning on December 6, 2022, but denying his claim under the FMLA. After Plaintiff internally appealed his FMLA denial, a Verily Human Resources supervisor found that Plaintiff's FMLA leave had been improperly denied and approved his FMLA leave

13

with retroactive application for December 6, 2022, through and including February 27, 2023.

**Verily Terminates Mr. Sloan in a Reduction In Force,**

**and Does Not Provide Him a Role Upon Return from Leave**

61.    On January 11, 2023, while on protected leave, Plaintiff received a phone call from Lisa Greenbaum that he would receive a job elimination communication, and that despite being absent on protected leave, he was expected to complete performance reviews. At the same time, Ms. Greenbaum informed Plaintiff that his email account and computer access would be turned off immediately, and that he should receive information for a transition email account.

62.    The transition email account was not properly set up; Plaintiff was forced to seek assistance to resolve the issue.

63.    To ensure he could complete the required performance reviews, Plaintiff saved several files to his Dropbox account.

64.    On January 11, 2023, Plaintiff was informed via email from the "Verily Leadership Team" that his position as Chief Commercial Officer had been eliminated due to a "reduction in force." The email further stated that Mr. Sloan's 2022 bonus would be funded "at target," meaning a bonus of 100% of his salary. Plaintiff forwarded the RIF email to his personal email.

65.    Plaintiff was not considered for other roles at Verily for which he was well-qualified. Verily severance paperwork included ADEA disclosures that indicated the position of his peer Rich Glenn, who also held the Level 8 job title "Verily Director, Sales – Direct Sales," had also been eliminated in the reduction in force as expected. However, the disclosures surprisingly showed that only Mr. Glenn *was* offered an alternative position.

66.    On January 12, 2023, Plaintiff learned from former employees that his job responsibilities, including managing the Onduo business and Verily's Retinal Camera Program, had been assigned to Rich Glenn. Despite Mr. Glenn's new role being named Head of Commercial rather than Chief Commercial Officer, the role had an equivalent job level (8) to Plaintiff's former position and entailed leading the Onduo commercial team, including Sales, Account Management, and Partnerships.  These responsibilities fell entirely within scope of Plaintiff's prior Chief Commercial Officer role. This contradicted the information provided by Ms. Greenbaum on November 14, 2022, when she indicated that Plaintiff's role

14

would be eliminated and the Onduo business deprioritized. Mr. Glenn was less qualified than Plaintiff for the "alternative position."

67.     Defendant wrongfully retaliated against Plaintiff in breach of contract by terminating his employment and without considering him for another role and offering the position to a less qualified candidate, a colleague who Verily's leadership deemed unlikely to disclose Verily's HIPAA violations.

68.     On or about January 13, 2023, Google Security contacted Plaintiff. He met with Annie Zhang, and explained that he had downloaded files to complete the required performance reviews. While she remoted into his computer and watched, he deleted the files on his Dropbox account. Ms. Zhang confirmed that nothing had been accessed. That same day, Plaintiff signed an affidavit attesting that he had deleted the files.

69.     Regardless, Defendant, through Lisa Greenbaum and Defendant's Human Resources insisted that Plaintiff complete the performance reviews, meeting with him on January 13, 2023 and following up via email on January 19, 2023.

70.     Contrary to Verily's representations that it was deprioritizing Onduo, throughout 2023, Defendant actively promoted the Onduo business (rebranded as Verily Onduo) and prominently featured Onduo as the primary product on its newly-rebranded website.  News articles in PR News Wire and WebMD Health Services confirm that Verily's Onduo business established new partnerships with major healthcare organizations such as WebMd. In an interview on November 20, 2024, Verily CEO Stephen Gillett highlighted the success of Onduo and cited a clinical study.[6]  As recently as May 2, 2025, Verily sponsored an Employer Benefit Conference to promote the Onduo Diabetes program (rebranded as Lightpath), despite Defendant justifying its RIF by claiming that Verily would cease selling Onduo to employers. It is not surprising that Verily did not deprioritize Onduo, as on October 8, 2022, Verily paid $175 million for the remaining 19% of Onduo, giving Onduo an enterprise valuation of close to $1 billion.[7]

71.     During Plaintiff's first eight weeks of protected leave (December 6, 2022-January 30,

---

[6] Dr. Adil Ali, "Alphabet's Verily is the future of precision and public health," *Fortune*, November 20, 2024 (available at https://www.onyxnewsroom.com/alphabets-verily-is-the-future-of-precision-and-public-health/).

[7] Sanofi disclosed the purchase price in its December 31, 2022 filing with the Securities and Exchange Commission. *See* Sanofi Form 20-F For the fiscal year ended December 31, 2022, at F-47, "Unquoted equity investments," (*available at* https://www.sec.gov/Archives/edgar/data/1121404/000112140423000008/sny-20221231.htm).

2023), he was paid his prorated Target Bonus of 100% of his base salary under Google's Carers Leave policy. The policy states "You're eligible to receive a bonus calculated using an on target individual multiplier [on-target bonus] for any time you're on leave during the perf cycle."

72.     Defendant forced Plaintiff to begin his transition period during his final four weeks of protected leave. Defendant initially refused to pay Plaintiff. Plaintiff appealed that the reduction in force notice from the "Verily Leadership Team" promised a "fully-paid transition period." Defendant claimed to correct an error, but underpaid Plaintiff by $27,692.31. Google's U.S. Payroll support team acknowledged the underpayment, and requested resolution from Amanda Devery, Verily Head of Total Rewards. On March 16, 2023, Ms. Devery claimed to be resolving the issue, but stopped responding despite follow-up requests on March 27, 2023, March 29, 2023, and April 12, 2023.

73.     As set forth above, Plaintiff's 2022 Sales Memorandum outlined his bonus plan and set his "target bonus" at 100% of his base salary of $360,000. Pursuant to his 2022 Sales Memorandum, in March 2023, Defendant paid Plaintiff three sales incentive bonus payments, categorized as "Commission" in Verily's payroll system, for gross amounts of $6,545.21 on March 9; $176,697 on March 10; and $183,240.21 on March 31, 2023. The net payment of the third amount was $120,208.97.

74.     Plaintiff attempted to negotiate the terms of his separation with Defendant. Although Defendant promised his target bonus verbally on November 14, 2022 and by email on January 11, 2023, in telephone discussions on February 3, 2023 and February 7, 2023, Defendant told Plaintiff he would receive approximately half of the target amount. Plaintiff objected and demanded Defendant provide written detail, and at no point did Plaintiff accept or agree that his bonus would be limited below his target amount. Defendant subsequently fulfilled payment of Plaintiff's Target Bonus with a third installment on March 31, 2023. But Defendant again reversed course on April 7, 2023 and inserted language in the proposed agreement stating that unless he signed it, Defendant would seek repayment of half of his target bonus payment.[8]

75.     On April 7, 2023, Plaintiff's final day of employment, Defendant sent Plaintiff a pay statement purporting to reverse the third bonus payment, for the gross amount of $183,240.21.

---

[8] Because Plaintiff had not submitted a claim at the time of these negotiations, the information is not subject to exclusion under Rule 408 of the Federal Rules of Evidence. *Cassino v. Reichhold Chemicals, Inc.*, 817 F.2d 1338, 1342 (9th Cir. 1987).

Defendant's actions occurred after the bonus was executed, taxed, and treated as earned commission income that Plaintiff was contractually due. There exists no enforceable clawback provision or policy applicable to Plaintiff that would permit such a reversal, and Plaintiff never consented to repayment or reduction.

76.    On April 13, 2023, Defendant contacted Plaintiff via email, stating "there was an overpayment of $183,240.21 paid as a sales incentive" and that the payment was "processed twice." Although the email stated the Google Overpayments Team would contact him "shortly" regarding the alleged overpayment, Plaintiff did not hear from Google Overpayments for 16 months.

77.    On June 12, 2023, within his review period to accept the final Separation Agreement from Defendant, Plaintiff through Counsel demanded modification to reflect that he was paid the Target Bonus promised to him on November 14, 2022 and January 11, 2023, and thus did not receive an overpayment on 3/31/23. Defendant ignored Plaintiff's demand.

78.    On June 12, 2023, Plaintiff through Counsel demanded his Separation Notice from Defendant. Plaintiff was ineligible to obtain State of Georgia Unemployment benefits due to Defendant's failure to comply with Code of Georgia Annotated § 34-8-10(c), which requires employers to issue a Separation Notice within three days of termination of employment. Defendant flatly ignored Plaintiff's demand.

79.    On June 12, 2023, Plaintiff through Counsel demanded from Defendant the underpayment of $27,692.31 he was due from his "fully-paid" transition period under Googles Paid Leave policy, but had not yet received. Defendant again flatly ignored Plaintiff's demand.

**Mr. Sloan Goes to the E.E.O.C.**

80.    On November 27, 2023, Plaintiff submitted a complaint to the U.S. Equal Employment Opportunity Commission ("EEOC") asserting associational disability discrimination.

81.    Defendant's CEO Stephen Gillette received Plaintiff's EEOC complaint on December 6, 2023; just **fourteen days later**, on or about December 20, 2023, Defendant, through then-counsel, demanded repayment of the largest of the three bonus payments, in an amount of $183,240.21 to be sent to Verily Chief People Officer Kerrie Peraino. Thus, it was not until Defendant learned that Plaintiff was asserting his rights that Defendant sought repayment. Defendant did not have legal basis for recovering

taxed and paid commission payments under Plaintiffs agreement.

82.     Plaintiff's arbitration agreement (p. 12) expressly prohibits retaliation for filing charge with EEOC. Page 12 of Plaintiff's Employment Agreement states: "Nothing in this Agreement prevents you from making a report to or filing a claim or charge with a government agency, including without limitation the Equal Employment Opportunity Commission, … The Company will not retaliate against you for filing a claim with an administrative agency or for exercising rights (individually or in concert with others) under the National Labor Relations Act. This Agreement also does not prevent or prohibit you from reporting, communicating about, or disclosing claims for discrimination, harassment, retaliation."

83.     On December 31, 2023, Defendant issued to Plaintiff a payroll statement that reclassified his previously paid bonus as gross income of $123,101.87, and then deducted $120,208.97 as "Collection Due," resulting in zero net pay. Moreover, Defendant reported the amount as taxable income and withheld $2,892.90 in Medicare tax, even though no funds were issued, creating double taxation of Plaintiff's third bonus payment. Furthermore, Defendant retained $63,040.24 of Plaintiff's withholdings instead of submitting withheld taxes to the IRS, in possible violation of tax laws. 26 U.S.C. § 6672.

84.     On February 1, 2024, despite being in possession of $63,040.24 from Plaintiff's withholdings, Defendant through counsel demanded Plaintiff make immediate payment of $183,240.21, an amount greater than the adjusted gross amount of $120,208.87.

85.     On March 26, 2024, Plaintiff and Defendant participated in an unsuccessful mediation session facilitated by the EEOC.

86.     After the unsuccessful mediation, on April 20, 2024, Defendant through then counsel submitted a Position Statement to EEOC Investigator Rosario Reyes. Defendant stated "immediately following the March 31 payment, the Company realized that the final payment was an accidental double payment as Complainant was only owed a total of $183,240.21. Thereafter, the Company requested Complainant repay the overpayment on December 20, 2023, and February 1, 2024 (Exhibit I). Complainant has ignored the Company's emails and has not returned the money he was accidentally overpaid."

87.     Defendant through former counsel provided false information to impugn Plaintiff's integrity and influence an EEOC investigation. However, Defendant had reclassified the gross payment

as $120,208.87 on December 31, 2023, and already retained $63,040.21 from Plaintiff. Furthermore, Defendant had no legal basis to pursue recovery of Plaintiff's promised and earned bonus, and to claim a debt to EEOC of more than Plaintiff received.

88.     On July 31, 2024, EEOC District Director Nancy A. Sienko provided Plaintiff with a right to sue letter.

89.     On or about August 5, 2024, Plaintiff finally received a communication directly from the Google Overpayments Team, seeking repayment of the third bonus payment he received in March 2023. In the email, Google Overpayments inaccurately claimed to have remitted Plaintiff's 2023 tax withholdings from the disputed bonus payment to the IRS, which it had retained instead. One hour and three minutes later, Plaintiff received a second email from Google, stating "Please disregard this email. During a cleanup effort, this email was unintentionally issued. We apologize for the confusion. Regards, Google Overpayments Team."

90.     On or about October 29, 2024, Plaintiff filed the instant action. A day after its agent for service was served with the action, on or about November 15, 2024, Defendant, through former counsel, threatened legal action and demanded immediate payment of $183,240.91. Defendant sought unjust enrichment as Defendant already retained $63,040.21 from Plaintiff and had reclassified the gross payment as $120,208.87.

91.     Until January 31, 2025, Defendant continued to erroneously assert that Plaintiff owed it $183,240.21. On January 31, 2025, Defendant sent a "clarification" email stating that the amount owed was actually $120,208.87. One week before a hearing in this case, Defendant demanded arbitration. Plaintiff paid Defendant under duress from arbitration and prior inflated demands.

92.     Plaintiff is aware of two former sales employees who, in March 2023, received commission payments that Defendant claimed were overpaid. Each sales employee received a single voluntary repayment request from Google Overpayments on December 15, 2023, had their net payments reclassified as gross payments on December 31, 2023, and have not heard anything further from Defendant, as of March 27, 2025.

93.     Plaintiff is aware of at least one former employee who received an overpayment of his long-term incentive plan in October 2022. Plaintiff notified Jeanette Cook from Verily HR of the

overpayment, which she acknowledged by email on February 14, 2023, stating "We did look into other individuals you mentioned and have identified an inadvertent payroll error which we are working on correcting." As of this filing date, Verily has not requested repayment.

94.      Defendant disregarded alleged overpayments for three similarly situated employees who did not file a charge with EEOC, as of March 27, 2025. Defendant had no legal basis to request payment from Plaintiff, who had been promised said bonus. Defendant violated its own Arbitration Agreement by retaliating against Plaintiff for filing a claim with an administrative agency.

**FIRST CAUSE OF ACTION**
*Retaliation in Breach of Contract*

95.      Plaintiff re-alleges and incorporates all preceding paragraphs of this complaint by reference as if fully set forth herein.

96.      Defendant and Plaintiff entered a contract in April 2022. Plaintiff fulfilled his part of the contract, namely, working for Defendant and following Defendant's Code of Conduct. Plaintiff complained that multiple HIPAA breaches were concealed and had not been ethically resolved, to include notifying impacted parties regarding illegal activity. Plaintiff's concerns were met with retaliation by Defendant, which terminated his employment and then refused to delay the start of his RIF benefits to accommodate his protect leave. In doing so, it breached its contract with Plaintiff that (1) required Plaintiff to report suspected violations of the law and (2) prohibited retaliation for such reporting.

97.      Defendant's Arbitration Agreement specifically excludes retaliation claims from arbitration. Accordingly, the cause of action is not subject to arbitration.

98.      Defendant's acts and omissions, including reduction of compensation and terminating Plaintiff's employment, constitute retaliation in breach of contract after Plaintiff reported illegal activity resulting from multiple breaches of HIPAA Business Associate Agreements.

99.      Defendant further retaliated against Plaintiff by demanding repayment of his earned bonus just fourteen days after receiving his EEOC complaint. Defendant had no contractual right to demand repayment of a commission from Plaintiff. Defendant has chosen to ignore Plaintiffs contractual claim that he was promised the disputed amount in having his bonus funded "at target". Defendant's own Arbitration Agreement explicitly prevents retaliation for filing a claim with an administrative agency.

100.     As a direct, foreseeable, and proximate result of Defendant's retaliatory actions, Plaintiff has suffered and continues to suffer economic damages that include, without limitation, loss of wages, salary, benefits and/or additional amounts of money he would have received but for Defendant's unlawful actions as alleged herein, in amounts subject to proof.

101.     Despite actively searching for work, Plaintiff was unemployed for a year. Plaintiff suffered damage to his reputation as Defendant first claimed Plaintiff's role was eliminated, then immediately gave a less qualified employee a role with the same job level and responsibilities. Plaintiff had to accept employment under substantially reduced compensation, and has been questioned if his termination was due to performance issues as his previous position was not actually eliminated.

102.     Plaintiff was ineligible to obtain State of Georgia Unemployment benefits for his full year of unemployment due to Defendant's refusal to comply with Code of Georgia Annotated § 34-8-10(c). Defendant has flatly ignored Plaintiff's demand for his Separation Notice.

103.     Further, due to the termination of his employment, Plaintiff has experienced severe mental health issues.

104.     The harm to Plaintiff was "physical" in the sense that it affected his emotional and mental health, rather than being a purely economic harm. *State Farm Mutual Automobile Ins. Co. v. Campbell*, 538 U.S. 408, 419 (2003). It was objectively reasonable to assume that Defendant's conduct towards Plaintiff would affect his emotional well-being, and therefore Defendant's "conduct evinced an indifference to or a reckless disregard of the health or safety of others." Plaintiff was an employee who relied on his regular paycheck to survive and therefore it appears he "had financial vulnerability." *Roby v. McKesson*, 47 Cal.4th 686 (2009).

## SECOND CAUSE OF ACTION
### *Retaliation in Violation of Title VII*
(42 U.S.C. § 2000e-3(a))

105.     Plaintiff re-alleges and incorporates all preceding paragraphs of this complaint by reference as if fully set forth herein.

106.     Title VII of the Civil Rights Act of 1964 prohibits retaliation against ""any individual...because has made a charge, testified, assisted, or participated in any manner in any investigation, proceeding, or hearing under this subchapter. 42 U.S.C. § 2000e-3(a).

107.    Defendant received Plaintiff's EEOC complaint on or about December 6, 2023. On or about December 20, 2023, Defendant demanded that Plaintiff repay a significant portion of his already-earned bonus.

108.    Plaintiff's 2020, 2021 and 2022 Sales Incentive Agreements did not provide authority to clawback any earned bonuses.

109.    Defendant through former counsel provided misleading information which impugned Plaintiff's integrity and potentially influenced an EEOC investigation. Defendant had no legal basis to pursue recovery of Plaintiff's promised and earned bonus, and to claim a debt to EEOC of more than Plaintiff received.

110.    On August 5, 2024, Google demanded repayment, falsely claiming it remitted Plaintiff's 2022 payroll tax withholdings to the IRS, and then almost immediately told Plaintiff to disregard its overpayment communication. Nonetheless, on November 15, 2024, seventeen days after Plaintiff filed this action, Defendant through then Counsel Littler demanded immediate payment of $183,240.21.

111.    On January 31, 2025, Google Overpayments sent Plaintiff a "Clarification" email that stated correctly, for the first time, that the amount Plaintiff had received was $120,208.87, not $183,240.21.

112.    On February 12, 2025, eight days before Case Management Conference, Defendant through current counsel filed arbitration against Plaintiff for an alleged overpayment Defendant had no written authority to recover. After Defendant initiated arbitration and the Court compelled Plaintiff's FMLA claim to arbitration, Plaintiff, under duress, sent a check to Defendant for $120,208.87, which Defendant cashed on March 3, 2025, thereby mooting its arbitration demand.

113.    Defendant's own Arbitration Agreement explicitly prevents retaliation for filing a claim with an administrative agency. As of March 27, 2025, Defendant disregarded alleged overpayments for three similarly situated employees who did not file a charge with EEOC. Defendant had no legal basis to request payment from Plaintiff, who had been promised said bonus.

114.    As a result of Defendant's retaliatory conduct, Plaintiff is entitled to compensatory and punitive damages

115.    Pursuant to 42 U.S.C. § 2000e-5, Plaintiff is entitled to attorney's fees and costs.

### THIRD CAUSE OF ACTION
*ADA Associational Discrimination*
(42 U.S.C. § 12112(b)(4))

116.     Plaintiff re-alleges and incorporates all preceding paragraphs of this complaint by reference as if fully set forth herein.

117.     Title I of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12111, *et seq.,* and its implementing regulation, 29 C.F.R. Part 1630, requires covered employers, such as Defendant, to provide reasonable accommodations to otherwise qualified employees who are known to have a relationship or association with a disabled person.

118.     Reasonable accommodation includes, but is not limited to, authorizing a change in the start date of termination benefits for an employee on protected leave.

119.     Plaintiff is an otherwise qualified individual who is known to be closely related to someone with a life-impairing disability, namely his mother. As stated above, Plaintiff notified Defendant of his mother's disability and requested to have his Reduction-in-Force benefits delayed until he was able to return to work and utilize them.

120.     Defendant incorrectly denied Plaintiff's initial protected leave request on December 19, 2022, falsely stating Plaintiff had worked for Defendant for less than twelve months, despite Plaintiff having been employed for over two years. Defendant corrected its error on January 10 and 11, 2023, with approval retroactive to December 6, 2022. Despite Defendant's own error causing delay of Plaintiff's protected leave request, Defendant's Chief People Officer flatly refused Plaintiff's reasonable accommodation request, claiming Plaintiff was not on protected leave as of January 11, 2023.

121.     Defendant forced Plaintiff to begin his transition period during his final four weeks of protected leave. Defendant promised a "fully-paid transition period," but initially refused to pay Plaintiff, then underpaid Plaintiff by $27,692.31. Defendant has ignored Plaintiff's demands for payment.

122.     Defendant's conduct as described in this complaint constitutes discrimination based on disability in violation of Title I of ADA, 42 U.S.C. § 12111, *et seq.,* and its implementing regulation, 29 C.F.R. Part 1630.

123.     As a result of Defendant's discriminatory conduct, Plaintiff suffered and continues to suffer damages.

124.    The above-described actions were perpetrated in the face of a perceived risk that Defendant's actions would violate federal law and warrant the imposition of punitive damages.

125.    Pursuant to 42 U.S.C. § 12205, Plaintiff is entitled to attorney's fees, including litigation expenses, and costs.

<u>**PRAYER FOR RELIEF**</u>

WHEREFORE, Plaintiff prays for judgment against Defendant as follows:

A.    An award for actual and compensatory damages, including lost wages, earnings, employee benefits, liquidated damages, and all other sums of money together with interest on these amounts and according to proof;

B.    For punitive damages;

C.    For emotional damages;

D.    For general, special, and incidental damages according to proof;

E.    Pre-judgment and post-judgment interest, as provided by law;

F.    Attorneys' fees and costs under applicable law, including expert fees and costs; and

G.    Such additional and further relief as this forum may deem just and proper.

ADDITIONALLY, Plaintiff demands trial of this matter by jury. The amount demanded exceeds $75,000.00.

Dated: June 17, 2025                                    **THE OTTINGER FIRM, P.C.**


                                                        /s/Melanie L. Proctor
                                                        MELANIE L. PROCTOR
                                                        Attorneys for Plaintiff