Robert W. Ottinger (SBN 156825)
Melanie L. Proctor (SBN 228971)
**THE OTTINGER FIRM, P.C.**
2108 N Street, Suite N
Sacramento, CA 95816
Tel: 415-262-0096
Fax: 212-571-0505
robert@ottingerlaw.com
melanie@ottingerlaw.com

*Attorneys for Plaintiff*
RYAN SLOAN

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| RYAN SLOAN,<br><br>  Plaintiff,<br><br>vs.<br><br>VERILY LIFE SCIENCES LLC, a Delaware Limited liability company,<br><br>  Defendant. | **Civil Action No.: 24-cv-07516-EMC**<br><br>**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS, COMPEL ARBITRATION, OR STAY**<br><br>Date:      August 28, 2025<br>Time:      1:30 p.m.<br>Courtroom: 5, 17th Floor<br><br>Honorable Edward M. Chen |

## I.  INTRODUCTION

Defendant moves to dismiss Plaintiff's retaliation claim, or in the alternative, compel the claim to arbitration. Defendant argues that Plaintiff's First Cause of Action, for retaliation in breach of contract, should be dismissed for failure to state a claim. Contrary to Defendant's pleadings, its Employee Handbook makes clear that its Code of Conduct is a binding legal agreement: it even lists the document in a section titled "Legal Agreements." Thus, Plaintiff's claim based on his Employment Agreement—that Defendant's retaliation against him was a breach of contract—is a valid claim. And because Defendant's arbitration agreement plainly exempts retaliation claims from arbitration, the Court should deny Defendant's motion to compel arbitration.

## II. ARGUMENT

### A. PLAINTIFF'S EMPLOYMENT CONTRACT BARS RETALIATION.

When construing a contract, federal courts look to applicable state law. *Revitch v. DirectTV, LLC*, 977 F.3d 713, 716 (9th Cir. 2020). Here, Plaintiff's Employment Agreement is governed by California law. Defendant's Motion, p. 4 n. 2; Dkt. 36-2, Declaration of Ryan Sloan ("Sloan Decl."), Ex. A, Employment Agreement, para. 12.[1] In California, "the elements of a breach of contract claim are (1) the existence of a contract, (2) performance or excuse of nonperformance, (3) defendant's breach, and (4) damages." S*aroya v. Univ. of the Pac.*, 503 F. Supp. 3d 986, 996 (N.D. Cal. 2020) (citing O*asis West Realty, LLC v. Goldman*, 51 Cal. 4th 811, 821 (2011)). The plain language of the contract governs its interpretation. *Id.* at 717, citing *Kashmiri v. Regents of Univ. of Cal.,* 156 Cal. App. 4th 809, 831 (Ct. App. 2007).

California also recognizes implied-in-fact contracts. *See* Cal. Civ. Code § 1621 (conduct of parties determines the existence of an implied-in-fact contract); *Guz v. Bechtel Nat. Inc.*, 24 Cal. 4th 317, 336–337 (2000) (describing factors "that may bear upon 'the existence *and content* of an . . . [implied-in-fact] agreement.'"), quoting *Foley v. Interactive Data Corp.*, 47 Cal. 3d 654, 680 (1988). The California Supreme Court explained that

> When an employer promulgates formal personnel policies and procedures in handbooks, manuals, and memoranda disseminated to employees, a strong inference may arise that the employer intended workers to rely on these policies as terms and conditions of their employment, and that employees did reasonably so rely.

*Guz*, 24 Cal. 4th at 344. Formal policies benefit both parties; "formal policies promote fairness and consistency, guarding against the arbitrary, capricious, and incongruous treatment of similar cases." *Ibid*. And from the employer's perspective, the policies may "enhanc[e] worker morale, loyalty, and productivity, providing competitive advantage in the labor market, and minimizing employee litigation." *Id.* at 344–345. Here, Plaintiff worked for Defendant from September 28, 2020 until Defendant terminated his employment in April 2023. SAC, ¶¶ 1, 4, 24, 61. He was therefore very familiar with

---

[1] The Employment Agreement is referenced in Paragraphs 3, 31, 32, and 82 of the Second Amended Complaint. For the convenience of the Court, a screenshot of the relevant page is included in the Declaration of Melanie Proctor in support of Plaintiff's Opposition to Defendant's Motion. Declaration of Melanie Proctor ("Proctor Decl."), ¶ 4.

Defendant's formal written policies.

Defendant argues that the Employee Handbook was not a contract and cites language therein that it argues proves the Code of Conduct is not a contract. Defendant's Motion, p. 5. But Defendant overlooks a key section: the Employee Handbook plainly states that Defendant's Code of Conduct *is* a legal agreement, and that in addition to the Confidentiality agreement, employees are "<u>are also bound</u> by Verily's Code of Conduct:"

> **Legal Agreements**
>
> **Confidentiality agreement**
> When you joined Verily, you signed an agreement containing various obligations including the requirement to hold confidential information, proprietary information, and trade secrets in strictest confidence. Please reference the terms of your agreement for specifics.
>
> **Code of Conduct**
> You are also bound by Verily's Code of Conduct. The Verily Code of Conduct outlines how to protect yourself from possible conflicts and the importance of keeping our proprietary information and trade secrets confidential. We encourage you to review the Verily Code of Conduct carefully.

See Proctor Decl., Ex. A, at p. 2 (emphasis added). The Confidentiality agreement and the Code of Conduct are the only two agreements referenced in the "Legal Agreements" section of the Employee Handbook. *Ibid.* By elevating the Code of Conduct to the same status as the Confidentiality agreement, Defendant created a reasonable expectation that notwithstanding its other statements about the Employee Handbook not being a contract, the Code of Conduct was, in fact, contractual. The Employee Handbook ends with a compulsory signature requirement: "After reviewing this document, please sign and date below[.]" Proctor Decl., Ex. A, at p. 4.

On this point, *Kashmiri* is instructive. In 1994, the University of California set a fee policy "that included an educational fee for all UC students and a professional degree fee (PDF) for some UC graduate students." *Kashmiri*, 156 Cal. App. 4th at 815. The policy stated it would be phased in over time, and in approving the policy, "the Regents declared that 'the level of the [PDF] remain the same for each student for the duration of [their] enrollment in the professional degree program, with increases in the fee applicable to new students only[.]'" *Id.* at 816. On its website, the Office of the President of the University maintained an "official" annual guide to student fees and deposits. *Ibid.* Although the website

stated that fees were subject to change without notice, at the web pages for professional school students between the academic years of 1994–1995 through 2002–2003, the pages stated that fee increases would apply to new students only. *Ibid.*

But, like Defendant's Employee Handbook, various catalogues and the University's website "cautioned that policies could be changed," including fees. *Id.* at 817. Although fees increased three times during between 1994 and the beginning of 2002, until December 2002 those increases did not reach continuing students. *Ibid.* Then, on December 16, 2002, and again in July 2003, the Regents approved increases in the PDF for all professional students, including continuing students. *Ibid.*

A group of students sued, asserting a breach of contract claim on behalf of professional students in three subclasses. *Id.* at 819. The trial court determined that "enforceable contracts existed between each of the three subclasses of students and the University and that the University breached those contracts by increasing the educational fees and the PDF." *Id.* at 820. The appellate court upheld that finding. And the appellate court held that students had "a reasonable expectation that the PDF would not be increased for the duration of their enrollment in their professional program." *Id.* at 841.

Here, because Defendant itself identified the Code of Conduct as a Legal Agreement, Plaintiff had a reasonable expectation that the Code of Conduct was, in fact, contractual. *Kashmiri*, 156 Cal. App. 4th at 841. He reasonably believed not only that *he* had to comply with the Code of Conduct but that *Verily, through its agents*, also had to comply. Instead, Defendant retaliated against Plaintiff for complying with his ethical duties as an employee and as a person with access to sensitive health information of private parties. When it retaliated against Plaintiff, Defendant breached the contract, whether express or implied.

The cases cited by Defendant are either non-citable or not on point.[2] In *Thomas Weisel Partners LLC v. BNP Paribas*, No. C 07–6198 MHP, 2010 WL 546497 (N.D. Cal. Feb. 10, 2010), the employment agreement included an express statement by the signer of the agreement that the handbook did not create a "contract of employment, express or implied." *Id.* at *8. Here, the Employment Agreement does not include such a statement. Dkt. 36-2, Sloan Declaration, Ex. A. And in *Scheller v.*

---

[2] See, e.g., *American Mortg. Network v. Loan City.com*, 2006 WL 3199291 (Ct. App. 2006) (stating above caption that decision is not published and thus non-citable).

*Interstate Realty Management*, 2:14–cv–0457 MCE KJN PS, 2014 WL 2918879 (E.D. Cal. June 24, 2014), the handbook "expressly and unambiguously provide[d], in bold print, that it [did] not confer contractual rights of any kind." *Id.* at *7.

While Defendant points to language in the handbook that states that it does "not form part of [a] employment contract/offer letter," it ignores the fact Defendant itself placed the Code of Conduct in a section titled "Legal Agreements." Defendant's Motion, pp. 5–6; *see Guz*, 24 Cal. 4th at 344 ("an employer's written personnel policies may be an important source of implied-contract evidence"). And, as Defendant admits, the Employment Agreement bound Plaintiff to comply with the policies in both the Handbook and the Code of Conduct. SAC, ¶ 32. Plaintiff reasonably understood from Defendant's own words and conduct that the Code of Conduct constituted a binding obligation, or an implied-in-fact contract.

Defendant also argues that the terms of the Code of Conduct are "merely informational" and "designed as a roadmap to provide [employees] with guidance." Defendant's Motion, p. 6. But the anti-retaliation terms are unambiguous: "VERILY PROHIBITS RETALIATION of any kind against anyone who reports concerns in good faith" and "We prohibit any form of retaliation or intimidation against anyone for their good faith report." SAC, ¶¶ 25, 33; Declaration of Liat Yamini, Ex. 1, p. 8–9. There is nothing ambiguous in these terms. Regardless, ambiguity in contracts is construed against the drafter. *International Brotherhood of Teamsters v. NASA Services, Inc.*, 957 F.3d 1038, 1042 (9th Cir. 2020). By elevating the Code of Conduct to be a Legal Agreement on par with the Confidentiality agreement, Defendant introduced ambiguity as to whether it was a legally binding document.

The Court should deny Defendant's Motion to Dismiss.

B. <u>THE COURT SHOULD DENY DEFENDANT'S MOTION TO COMPEL ARBITRATION BECAUSE RETALIATION CLAIMS ARE EXEMPT.</u>

Defendant asserts that if Plaintiff's First Cause of Action survives dismissal, it must be compelled to arbitration because it is a breach of contract claim. Defendant's Motion, pp. 7–9. But if Plaintiff sufficiently stated a claim upon which relief may be granted, then it is a claim for retaliation. There is no dispute that Defendant's arbitration clause exempts retaliation claims. Defendant's Motion to Dismiss or Compel, p. 8. Although Defendant attempts to strip the retaliation element from the breach of contract

claim, it cannot do so. The alleged breach *is* retaliation in violation of Defendant's binding agreements. SAC, ¶¶ 95–104.

For the same reason, Defendant's suggestion that an arbitrator should decide whether the claim is subject to arbitration is without merit. Defendant's Motion, pp. 8–9. The Arbitration Agreement plainly excepts claims for retaliation from arbitration. SAC, ¶ 97. And the Arbitration Agreement states in full that "*Except as otherwise stated in this Agreement*, you and the Company agree that any legal dispute or controversy covered by this Agreement, or arising out of, relating to, or concerning the scope, validity, enforceability, waiver, or breach of this Agreement, shall be resolved" by arbitration. Dkt. 28-1, Declaration of Jessical Schultz, Ex. 1, paragraph 1. Because the Arbitration Agreement provides that claims for retaliation are not subject to arbitration, if the Court finds Plaintiff has stated a claim upon which relief may be granted, then Plaintiff's claim is not arbitrable in any way.[3]

The Court should deny Defendant's Motion to Compel Arbitration.

### III.   CONCLUSION

The Court should deny Defendant's Motion in its entirety.

THE OTTINGER FIRM, P.C.

Dated: July 31, 2025

/S/Melanie L. Proctor
Melanie L. Proctor
*Attorneys for Plaintiff, Ryan Sloan*

---

[3] Notably, when Defendant acquired the last shares of Onduo and fully acquired that subsidiary, it incorporated Plaintiff's prior Onduo LLC Restrictive Covenant Agreement into his contract. Dkt. 36-2, Sloan Decl., Ex. A (second paragraph reading: This offer, together with Exhibits A & B and your previously signed Onduo LLC Restrictive Covenant Agreement (the "Onduo CIIAA"), is the complete agreement…"). The Onduo CIIAA did not include an arbitration clause. The Onduo CIIAA further bound Plaintiff to Defendant's Code of Conduct: "Section 8. Corporate Compliance. I agree that I will abide by all policies and procedures that Onduo may have in effect from time to time, including without limitation, Onduo's Code of Conduct and corporate compliance program. I further acknowledge that failure to abide by policies and procedures may result in discipline, including immediate termination of my employment."